DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**JABARI KEMP,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D15-3472

[December 13, 2017]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; John S. Kastrenakes, Judge; L.T. Case No. 502013CF006185A.

Carey Haughwout, Public Defender, and Karen E. Ehrlich, Assistant Public Defender, West Palm Beach, for appellant.

Pamela Jo Bondi, Attorney General, Tallahassee, and Allen R. Geesey, Assistant Attorney General, West Palm Beach, for appellee.

MAY, J.

A tragic accident resulted in the death of five people, and the defendant's conviction on five counts of vehicular manslaughter. He appeals his conviction and sentence. He argues the trial court erred in admitting the testimony of an accident re-constructionist, and he was procedurally prejudiced by the late disclosure of an expert opinion. We disagree and affirm.

On the evening of the accident, the defendant was driving a Mercedes coupe northbound on I-95. He exited at Blue Heron Boulevard. According to the lead accident investigator, the curvature of that exit "would require a person to make their vehicle maneuver in such a way to make that curve."

The defendant's car ran the red light at the end of the exit ramp, continued straight into the perpendicular lanes of traffic, and crashed into the side of a Lexus sedan that was proceeding eastbound with the green light. The State presented expert testimony that the defendant's car was

travelling at 128.7 mph at the time of impact. Both cars went across the median and came to rest beyond the westbound lanes of traffic.

The five young people in the Lexus died as a result of the accident. When paramedics arrived, the defendant was awake but "mostly in and out of consciousness." The defendant had to be extricated from his car.

A key factual dispute was whether the defendant lost consciousness before the crash. His defense was that he blacked out and did not have control of the car at the time of the collision. He testified that he felt "very faint" about "a second or two" into the Blue Heron exit. He explained that he had never fainted before and did not know he was going to pass out. He recalled driving 65 to 70 mph before he lost consciousness. The next thing he remembered was waking up in the hospital.

Defense counsel argued that the defendant's height and manner of sitting in his car meant that his "foot likely depressed on that pedal" after the defendant passed out, which would explain how the vehicle could have reached 128 mph. The defendant testified that he was five foot and eleven inches tall. His Mercedes sports car sat "kind of low," and the gas pedal was "very responsive."

A passenger in a car that passed the Lexus, described the defendant's car exiting the ramp: "It was a flying like it was – it was like somebody was unconscious in the car just going, [vroom]. It was – I thought it was flying because it wasn't turning, it was just going straight. It was just, like – like a plane diving." According to this witness, the defendant's car did not attempt to brake.

A police officer at an unrelated traffic stop about 400 feet away from the accident "heard the sound of tires screeching on a highway effectively applying brakes and then . . . heard a large pop or a bang which was indicative of a collision having occurred." But, the officer did not see the accident, and did not know which car made the screeching sound.

Corporal Johnson was the lead investigator. He testified that he did not see any roadway tire marks indicating the defendant was braking immediately before the crash. He was assisted by Corporal Dooley, who performed the speed calculations.

Both issues on appeal arise from Corporal Dooley's testimony. Over the defense *Daubert*[1] objection and another objection to a State discovery

---

[1] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

violation, the trial court admitted Dooley's opinion that the damage to the Lexus indicated the defendant was braking his vehicle as the collision occurred.

Specifically, Dooley testified that the crush damage to the Lexus went downward in "an arc-type fashion," which indicated the front end of the defendant's car was dipping as it collided with the Lexus. If a car is dipping, Dooley explained, this indicates "that there is some type of braking or driver input."

Dooley stated that if the defendant's vehicle had not been dipping, there would be "more of a flatter type crush pattern." Dooley claimed that the damage to the Lexus started at the normal height one would expect, but arcs downward. According to Dooley, it was the arc of the damage to the Lexus—not its height from the ground—that was indicative of dipping.

The jury found the defendant guilty as charged on all five counts. The court granted a downward departure and sentenced the defendant to five consecutive terms of six years in prison, for a total of 30 years. From his conviction and sentence, the defendant now appeals.

The defendant first argues the trial court erred by admitting Dooley's braking opinion, because it did not meet the requirements of section 90.702, Florida Statutes (2015), and *Daubert*.[2] Because the parties relied on *Daubert* at trial and because neither party challenged the validity or constitutionality of the *Daubert* Amendment, we apply *Daubert* to this appeal. *See Clare v. Lynch*, 220 So. 3d 1258, 1261–62 (Fla. 2d DCA 2017) (applying a statutory amendment governing expert witness qualifications in medical malpractice cases, despite the Florida Supreme Court's refusal to adopt the amendment "to the extent it is procedural," where the relevant party did not raise the constitutionality of the statute).

We review a trial court's ruling on the admissibility of expert testimony under section 90.702 for an abuse of discretion. *Booker v. Sumter Cnty. Sheriff's Office/N. Am. Risk Servs.*, 166 So. 3d 189, 194 n.2 (Fla. 1st DCA 2015).

---

[2] During this appeal, the Supreme Court of Florida declined to adopt the legislature's "*Daubert* Amendment" to the Florida Evidence Code to the extent that it is procedural. *In re Amendments to Fla. Evidence Code*, 210 So. 3d 1231, 1239 (Fla. 2017). The court did not address the constitutionality of the *Daubert* Amendment, stating that the constitutional concerns raised "must be left for a proper case or controversy." *Id.* at 1239.

*Daubert* assigned the trial judge as gatekeeper to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589. That obligation applies not only to "scientific" testimony, but "to all expert testimony." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).

The Court articulated factors bearing on the reliability inquiry:

(1) whether the theory can be or has been tested;

(2) whether the theory or technique has been subjected to peer review and publication;

(3) the known or potential rate of error of a particular scientific technique, as well as the existence of standards controlling the technique's operation; and

(4) general acceptance in the scientific community.

*Daubert*, 509 U.S. at 593–94. The Court advised however that the "test of reliability is flexible, and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire*, 526 U.S. at 141 (internal quotation marks omitted).

Section 90.702, Florida Statutes, provides that expert testimony is admissible if:

(1) The testimony is based upon sufficient facts or data;

(2) The testimony is the product of reliable principles and methods; and

(3) The witness has applied the principles and methods reliably to the facts of the case.

The Court has explained:

Experts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called "general truths derived from . . . specialized experience." And whether the specific expert testimony focuses upon specialized observations, the specialized translation of those observations into theory, a specialized theory itself, or the application of

4

such a theory in a particular case, the expert's testimony often will rest "upon an experience confessedly foreign in kind to the jury's own." The trial judge's effort to assure that the specialized testimony is reliable and relevant can help the jury evaluate that foreign experience, whether the testimony reflects scientific, technical, or other specialized knowledge.

*Kumho Tire*, 526 U.S. at 148-49 (citations omitted).

Here, there can be no doubt that Corporal Dooley was an expert in accident reconstruction. He testified that he had been employed with the Florida Highway Patrol for thirteen years, and had been a homicide investigator for more than five years. His training was extensive. He testified about his training as follows:

It's very extensive, first and foremost you start off with the basic homicide investigations which kind of gets you into mathematical formulas and dynamics of how crashes happen and basically overall scene work and then you go into more advanced schools like advanced traffic homicide and reconstruction -- where that gets more into nuts and bolts of how to properly reconstruct a crash and then you get into more specific -- more advanced dealing with specific items like motorcycles, pedestrians, trains, commercial motor vehicles.

There is just a lot of stuff that as you progress it gets more and more specific. In total it's probably been -- if you would add it all up together probably in excess of 800 plus hours in the class room and actually out in the field doing this training prior to even investigating things.

He had been the primary investigator in more than sixty-five accidents and assisted in over two hundred. His role was to assist in "mapping the scene using [photogrammetry]." He was there to make an independent determination of how the crash occurred. From his observations, photographs, and measurements, he was able to construct a three dimensional model of the accident scene. He was also able to create a crash zone using specific software.

Corporal Dooley conducted a post-crash inspection of the vehicles. He inspected the car for "crush damage," mechanical defects, tire malfunction, and damage profiles, anything that happened as a result of the crash. He explained the damage profile as providing information on the angle of approach, how far the crush went into the vehicle, and the

angle of departure. The damage profile also provides information on whether braking occurred. He explained:

> When you have two cars that are relatively similar in height . . . , as somebody is approaching a car . . . they are not paying attention or whatever it is, and at the last second they brake right before impact. And the front end will dip and it will go down and it will smack the rear of the car or whatever the case is. Normally, that's from you're traveling at a speed and as you hit the brakes, center mass, the momentum is going forward so it's going to push that momentum forward causing the front end to dip. I'm sure we have all done it, whether you accelerate and the front end goes up, or you hit the brakes and the front end goes down, but that's what we are looking for is how up the damage profile is.
>
> . . . .
>
> What we have here is, up to here this is the right rear passenger door of the Lexus. And as you can see here, it's kind of bowed out a little bit, and then when you look further down you notice how it appears to get deeper and deeper and deeper. When you get down to the bottom of it that's the frame right there, okay? So when you look at this damage profile this to me is obviously a significant impact. But when you have all of this up here, which is kind of in line with whatever the car may or should have been, and then as you start looking down, down, down, it starts to get deeper and deeper and deeper as you get down to the --

At this point, the defense objected, and the court permitted voir dire before Corporal Dooley rendered his opinion. The voir dire was extensive with the judge asking questions to ensure his role as gatekeeper.

> [CORPORAL DOOLEY]: Well, when you have such a tremendous speed going down and so much energy and momentum, the car is -- if it's not dipping, or going up, or accelerating, it's going straightforward. Whatever it's going to hit and when it hits you would have the crushing factor. It would be more upright but, again, like I said, when I see this based on everything I've seen in the past, all my training and experience, it shows me that the car hits and goes down, is what it tells me. That's all I can testify to. That's what it tells me is that it hits but it's going down.

6

THE COURT: And that is consistent within a reasonable degree of scientific certainty with braking of the Mercedes?

[CORPORAL DOOLEY]: I can't tell you about the scientific -- or anything about the braking of the Mercedes. What I can tell you is the overall dynamics of a car to require to have shocks and struts and all these things and if you are accelerating, the front will go up. If you are decelerating it goes down -- that's all I can -- I'm just telling you what it means to me.

THE COURT: Is it consistent with braking?

[CORPORAL DOOLEY]: Yes.

THE COURT: Is it consistent with any other scenario other than braking?

[CORPORAL DOOLEY]: I, personally, cannot think of anything that it would be consistent with --

THE COURT: Okay.

[PROSECUTOR]: If I could ask him one additional question. . . . When the Judge asked you if it's within a degree of scientific certainty, when we talk about science what you are discussing deals with a car going downward, deals with the laws of physics and momentum, correct?

[CORPORAL DOOLEY]: Yes, ma'am.

[PROSECUTOR]: Okay. And that would be science?

[CORPORAL DOOLEY]: Yes, ma'am.

. . . .

[DEFENSE COUNSEL]: Are there any studies on this dipping effect, the curling downward?

[CORPORAL DOOLEY]: I'm sure that there are but I can't quote anything specific.

7

[DEFENSE COUNSEL]:  None that you have read?

[CORPORAL DOOLEY]:  Yes, we've actually -- when we go out and we do a lot of these more specific schools, like I testified to earlier . . . that I've attended, we go out and we will crash vehicles, we will throw motorcycles off the back of trucks and watch them spin, but to classify like as actually studying I personally cannot recall anything specific dealing with it. Other than talking about momentum in general when weights are transferred from the center mass forward because that's where the momentum was going.  And as they apply the brakes, the momentum shifts forward, and as you accelerate, the momentum shifts backwards, talking about dynamics of how cars work.  But as far as quoting an actual case study or a doctor or scientist or whomever may have been out there looking at it, I can't tell you.

[DEFENSE COUNSEL]:  Okay.  And that would have nothing to do with the fact that the Lexus was a heavier vehicle at the time?

[CORPORAL DOOLEY]:  Heavier vehicle and damage profile, I can't see any type of issue with that but it just appears like I said this, I'm just testifying as to what this looks like to me --

[DEFENSE COUNSEL]:  Okay.  Thank you.

. . . .

THE COURT:  Corporal, is this -- is this type of downward arc in damage something that is taught at you know accident reconstruction classes that you have done?

[CORPORAL DOOLEY]:  There are examples that are given. Unfortunately, you can't cover every single type of scenario that a crash will happen in, but no there are examples given and again explain to you how when a vehicles weight shifts and different things like that and we learn about speed calculations if a car swerved to avoid and all of the load goes to one side, and it will leave a tiny thin mark.  We learn about weight transfer and momentum transfer, and then we go into when vehicles collide with others and how they transfer their momentum or kinetic energy to the other vehicle.  But we do learn about these things, but I can't quote you anything

8

specific off the top of my head as to a case study or somebody who is in the know, specifically.

. . . .

THE COURT: All right. The Court will admit this opinion. I'm admitting this opinion as a gatekeeper. I have through counsel's questions and the Court's questions undertaken an -- you know, an examination of Corporal Dooley, as to reliability of this type of evidence.

I do find that it is quote/unquote not junk science, that, in fact, it is taught. It is part and parcel of the training with respect to accident reconstruction. That this -- a witness has -- certainly has the training and hours of experience to opine as to accident reconstruction. He specifically discussed the evidence that he has seen on the damage to the Lexus that corresponds to an opinion that -- of a dipping damage, which is consistent within his opinion of a car braking.

I'm going to allow the opinion to come in, subject, of course, to the weight of this opinion as being borne out by [defense counsel's] cross-examination, but I do find that this opinion is sufficiently reliable. <u>Daubert</u>, don't forget, is a rule of admissibility as opposed to inadmiss[i]bility. And I do find that it's not a pure opinion of the corporal but it's instead based on training, experience, he's got the expertise. And I do find as a gatekeeper that it is sufficiently reliable and sufficiently factually based to allow this opinion into the -- into evidence in this trial.

I may have some more with respect to a ruling on this but at this juncture I am going to allow the opinion subject to the weight to be attached to it by a cross-examiner.

The court then explained to the jury:

[Defense counsel's] objection to the opinion as to whether the Mercedes was braking or not, their objection to that is overruled. Of course, you decide what weight you wish to give to anyone's opinion, you can accept it or reject it, or accept part of it that's totally up to you -- I'm going to turn back now to the assistant State attorney to continue her direct examination.

Corporal Dooley then testified that the photographs showed that the front end of the defendant's vehicle was dipping as the cars collided. That indicated to him that "there [was] some type of braking or driver input." Without some type of braking,

> you would have more of a flatter type crush pattern . . . that curvature to that crush damage that's what it tells me is that the car -- the front of the car that's doing the hitting is coming in and as it's hitting the front end is dipping and going down.
>
> . . . .
>
> Transfer momentum transferring to the front of the car putting the load on the front.

As the Court declared in *Daubert*, the trial judge is assigned "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. Pertinent evidence based on scientifically valid principles will satisfy those demands." 509 U.S. at 597. Here, the trial court did just that. We affirm.

CIKLIN, J., concurs.
TAYLOR, J., dissents with opinion.

TAYLOR, J., dissenting.

I respectfully dissent. Corporal Dooley's braking opinion was not shown to be based upon sufficient facts or data, nor was it shown to be the product of reliable principles and methodology. His testimony amounted to little more than a subjective and unverifiable opinion and represents precisely the sort of junk science that should never be countenanced in a court of law. Accordingly, I would hold that the trial court abused its discretion in admitting unreliable expert witness testimony that did not meet the requirements of *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). The majority opinion emphasizes Corporal Dooley's experience and quotes long portions of his testimony, but fails to undertake any analysis of how the braking opinion relates to the *Daubert* factors.

One of the key factual disputes at trial was whether appellant had lost consciousness shortly before the crash. The state was required to prove at trial that appellant operated his motor vehicle "in a reckless manner likely to cause the death of, or great bodily harm to, another," which is a

10

required element of vehicular homicide.[3]   However, evidence that a defendant merely lost control of a vehicle is insufficient, without more, to prove reckless driving.  *Smith v. State*, 218 So. 3d 996, 998 (Fla. 2d DCA 2017).

In this case, the state offered Dooley's braking opinion to establish that appellant was in control of the vehicle at the time of the accident.  Because this case was tried under the *Daubert* standard,[4] the trial court had a gatekeeping function to ensure that Dooley's testimony was reliable.  However, in admitting Dooley's braking opinion, the trial court essentially deferred to Dooley's expertise and took Dooley's word for it, without any meaningful consideration of the *Daubert* factors.  Therefore, as I explain below, the trial court did not adequately fulfill its gatekeeping function in this case.

In Florida, since 2013, we have applied the standards for expert testimony in our courts as provided in *Daubert*.  *See Crane Co. v. DeLisle*, 206 So. 3d 94, 101 (Fla. 4th DCA 2016), *rev. granted*, No. SC16–2182 (Fla. July 11, 2017).  Section 90.702 codifies the standard as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact in understanding the evidence or in determining a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify about it in the form of an opinion or otherwise, if:

---

[3] Vehicular homicide is defined as "the killing of a human being . . . caused by the operation of a motor vehicle by another in a reckless manner likely to cause the death of, or great bodily harm to, another."  § 782.071, Fla. Stat. (2012). Vehicular homicide therefore requires proof of reckless driving—that is, driving with a "willful or wanton disregard for the safety of persons or property." *Santisteban v. State*, 72 So. 3d 187, 195 (Fla. 4th DCA 2011) (citations and internal quotation marks omitted).  "Willful" means "intentional, knowing, and purposeful," and "wanton" means with a "conscious and intentional indifference to consequences and with knowledge that damage is likely to be done to persons or property."  *Lewek v. State*, 702 So. 2d 527, 530–31 (Fla. 4th DCA 1997) (citations and internal quotation marks omitted).  "In determining whether a defendant was driving recklessly, the essential inquiry is whether the defendant *knowingly* drove the vehicle in such a manner and under such conditions as was likely to cause death or great bodily harm."  *Santisteban*, 72 So. 3d at 195 (emphasis added).

[4] The parties relied upon the *Daubert* standard at trial and neither party presented any argument below challenging the validity of the legislature's 2013 *Daubert* Amendment.

(1) The testimony is based upon sufficient facts or data;

(2) The testimony is the product of reliable principles and methods; and

(3) The witness has applied the principles and methods reliably to the facts of the case.

§ 90.702, Fla. Stat. (2014).

Under *Daubert*, a trial judge has a gatekeeping role to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589. The trial judge is charged "with this gatekeeping function 'to ensure that speculative, unreliable expert testimony does not reach the jury' under the mantle of reliability that accompanies the appellation 'expert testimony.'" *Crane*, 206 So. 3d at 101 (quoting *Hughes v. Kia Motors Corp.*, 766 F.3d 1317, 1328–29 (11th Cir. 2014)).

A trial judge must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93. This basic gatekeeping obligation applies not only to scientific testimony, but "to all expert testimony." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999).

The Supreme Court in *Daubert* outlined a list of factors that bear on the reliability inquiry: (1) whether the theory can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of a particular scientific technique, as well as the existence of standards controlling the technique's operation; and (4) general acceptance in the scientific community. 509 U.S. at 593–94. The *Daubert* "test of reliability is flexible, and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire*, 526 U.S. at 141 (internal quotation marks omitted).

"[T]he test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology." *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995) ("*Daubert II*"). However, an expert's opinion must be based upon "knowledge," not merely "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. Nothing in *Daubert* requires a court "to admit opinion evidence that is

connected to existing data only by the *ipse dixit* of the expert," and "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Here, Dooley's braking opinion was inadmissible under *Daubert*. The record does not show that Dooley's technique—eyeballing the shape of the crash damage on a vehicle to determine if the vehicle that made the impact was braking—has been tested, has been subjected to peer review or publication, has a quantifiable rate of error, or is generally accepted in the field of accident reconstruction. Dooley's repeated invocation of the magic words "training and experience" was insufficient, without more, to establish the reliability of his opinion under *Daubert*. As we explained in *Crane*, "where an expert relies solely or primarily on their experience, the proponent of the testimony has the burden 'to explain how that experience led to the conclusion [the expert] reached, why that experience was a sufficient basis for the opinion, and just how that experience was reliably applied to the facts of the case.'" 206 So. 3d at 102 (quoting *United States v. Frazier*, 387 F.3d 1224, 1265 (11th Cir. 2004) (en banc)).

Simply put, Dooley opined that because the damage to the Lexus went downward in an "arc-type fashion," appellant's car must have been dipping at the time of the collision, which indicated that appellant was braking. Dooley's opinion can therefore be broken down into two distinct components: (1) applying the brakes causes the front of the driver's vehicle to dip downward; and (2) Dooley was able to look at the shape of the damage to the Lexus to infer that appellant's vehicle was dipping, and therefore braking, at the time of the collision. The first component of Dooley's opinion was supported by the laws of physics and momentum. But the second component of Dooley's opinion—which I will refer to as the "braking opinion"—was never shown to be reliable.

Although Dooley initially implied that his braking opinion was based upon the collection of data, it later became apparent that his opinion was based solely on his visual impression of the shape of the damage to the Lexus. Dooley admitted that his opinion was not based on height measurements of the vehicles or the height of the damage to the Lexus. Dooley at one point acknowledged: "I'm just testifying as to what this looks like to me."

Dooley testified that "when I see this based on everything I've seen in the past, all my training and experience, it shows me that the car hits and goes down, is what it tells me. That's all I can testify to." At one point, Dooley admitted that he could not recall studying in his accident

reconstruction classes the specific issue of the "curling downward" of damage due to the dipping effect:

> [W]e go out and we will crash vehicles, we will throw motorcycles off the back of trucks and watch them spin, ***but to classify like as actually studying I personally cannot recall anything specific dealing with it***. Other than talking about momentum in general . . . . But as far as quoting an actual case study . . . I can't tell you.

(emphasis added).

Dooley thus admitted that he had not studied this exact scenario in his course work. Later, however, when asked whether "this type of downward arc in damage" was something he was taught in accident reconstruction classes, he vaguely replied that "[t]here are examples that are given," that "you can't cover every single type of scenario that a crash will happen in," that he learned about "weight transfer" and "momentum transfer" in his classes, and that "we do learn about these things, but I can't quote you anything specific off the top of my head as to a case study or somebody who is in the know, specifically."

In my view, contrary to the trial court's conclusion, Dooley's testimony—when examined in its entirety—does not actually support that he was taught how to examine the shape of crash damage to determine whether the vehicle that caused the damage was braking at the time of the collision. The prosecution did not meet its burden to explain how Dooley's experience led to the conclusion he reached, why that experience was a sufficient basis for the braking opinion, and just how that experience was reliably applied to the facts of this case.

The deficiencies in Dooley's methodology became even more apparent on cross-examination. Dooley admitted that he did no testing in this case to formulate his braking opinion. Dooley did not know anything about the metallurgy of the Lexus, whether the Lexus was weaker toward the bottom than the top, or whether the Lexus had been in any prior collisions. When asked how he could exclude the possibility that the damage to the Lexus was not "just as a result of the natural shape and weight of that Mercedes," Dooley essentially responded that his "training and experience" allowed him to reach such a conclusion.

I would hold that Dooley's testimony was woefully insufficient to establish the reliability of his methodology under *Daubert*. There was no evidence that Dooley's methodology had ever been tested, nor was there

evidence that Dooley's methodology had been subjected to peer review and publication. Dooley could not reference any specific studies or peer-reviewed materials, much less any blind studies showing that it is possible to accurately infer braking from the shape of crash damage alone. Dooley assumed that there were studies on the "curling downward" of damage due to the dipping effect, but he could not "quote anything specific." Dooley did not specifically point to any experience or training where the occurrence of braking was determined solely on the basis of someone's visual impression of the shape of crash damage. For example, Dooley never testified that he received training in the examination of collision damage known to have occurred after braking, and how such damage compares to collision damage known to have occurred without braking.

On this record, it is also impossible to quantify a potential rate of error for Dooley's methodology. Dooley's testimony failed to address what the "known or potential rate of error" was for attempting to discern braking from a visual inspection of the shape of crash damage to another vehicle. The absence of any testimony in this regard further undermines the reliability of Dooley's methodology.

The state also failed to show that Dooley's opinion was based upon a generally accepted methodology in the field of accident reconstruction. Dooley testified that his opinion dealt with science—specifically, the laws of physics and momentum. Notably, when asked whether the damage to the Lexus was "consistent within a reasonable degree of scientific certainty" with the Mercedes braking, Dooley simply replied: "I can't tell you about the scientific – or anything about the braking of the Mercedes. . . . I'm just telling you what it means to me." Instead, the best Dooley could do was reiterate the obvious point that the front of a car goes up when accelerating and goes down when decelerating.

Thus, while the laws of physics and momentum provided a reliable basis for Dooley's testimony that the front of a vehicle dips downward while braking, there was no showing that simply looking at the shape of crash damage on a vehicle is a generally accepted methodology in the field of accident reconstruction for determining whether the vehicle that made the impact was dipping (and therefore braking) before the collision.

In short, Dooley's braking opinion was insufficient to satisfy *Daubert*. None of the *Daubert* factors supported the admissibility of the opinion. Dooley did not rely on anything much in formulating this braking opinion, other than his subjective visual impression of what the damage to the Lexus "look[ed] like to [him]." There was simply too great an analytical gap between Dooley's observations and the braking opinion proffered.

15

The improper admission of Dooley's testimony was not harmless. *See State v. DiGuilio*, 491 So. 2d 1129, 1135 (Fla. 1986). The dispute over whether appellant was braking at the time of the collision went to the heart of appellant's defense that he had lost consciousness immediately before the accident. I would reverse and remand for a new trial.

\*     \*     \*

***Not final until disposition of timely filed motion for rehearing.***